UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

--------------------------------------------------------x
                                                        :
ANTHONY PASQUALE CALANDRO          :          3:13 CV 952 (JGM)
                                                        :
V.                                                      :
                                                        :
CAROLYN W. COLVIN,                       :
ACTING COMMISSIONER OF             :
SOCIAL SECURITY                          :
                                                        :          DATE:   MARCH 3 , 2014
-------------------------------------------------- x

RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS
AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

         This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), as amended,

seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying plaintiff

disability insurance benefits ["DIB"].

I.  ADMINISTRATIVE PROCEEDINGS

         On June 10, 2010, plaintiff Anthony Pasquale Calandro, applied for DIB claiming that he has

been disabled since December 15, 2009, due to degenerative disease of the lumbar spine and

posttraumatic arthritis of the right ankle.  (Certified Transcript of Administrative Proceedings, dated

August 27, 2013 ["Tr."] 175-76, 217; see Tr. 49, 88).   The Commissioner denied plaintiff's

application initially and upon reconsideration.  (Tr. 112-26).  On February 23, 2011, plaintiff filed

a request for a hearing before an Administrative Law Judge ["ALJ"].  (Tr. 127). Plaintiff was, and

continues to be, represented by counsel.  (Tr. 111, 164, 173-74).  On October 14, 2011, a hearing

was held before ALJ Yvette N. Diamond at which plaintiff and a vocational expert, Albert J. Sabella

(Tr. 162-63), testified. (Tr. 46-87).  On November 10, 2011, ALJ Diamond issued an unfavorable

decision denying plaintiff benefits.  (Tr. 25-36).  On May 6, 2013, the Appeals Council denied

plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the

Commissioner.  (Tr. 1-5).

On July 5, 2013, plaintiff filed his complaint in this pending action (Dkt. #1), and on September 17, 2013, defendant filed her answer, along with a copy of the Certified Administrative Transcript, dated August 27, 2013.  (Dkt. #8).[1]  On November 18, 2013, plaintiff filed his Motion for Judgment on the Pleadings and brief in support.  (Dkts. ##11-12).  On January 13, 2014, defendant filed her Motion to Affirm, with brief and exhibit in support.  (Dkt. #14).

Accordingly, for the reasons stated below, plaintiff's Motion for Judgment on the Pleadings (Dkt. #11) is <u>granted such that the case is remanded for further proceedings consistent with this Recommended Ruling</u>, and defendant's Motion to Affirm (Dkt. #14) is denied.

<u>II. FACTUAL BACKGROUND</u>

<u>A. PLAINTIFF'S ACTIVITIES OF DAILY LIVING AND EMPLOYMENT HISTORY</u>

Plaintiff was born in 1964; he is forty-nine years old. (Tr. 50). Plaintiff is divorced with three adult children.  (Tr. 50-51).  At the time of his hearing, plaintiff was living in a house with his parents, sister and her two children.  (Tr. 51).  He has graduated from high school and a technical vocational school where he received training as an auto body mechanic.  (Tr. 52).[2]  Although he has a driver's license, he rarely drives, instead getting rides from his parents.  (Tr. 51).

On a typical day, plaintiff dresses and bathes independently.  (Tr. 59-60).  He makes coffee for his parents and stays at home most of the day.  (Tr. 60, 199).  His mother does all of the cleaning, cooking and laundry.  (Tr. 60, 201-02, 230-31).  Plaintiff can make only simple meals; he does not think he would be able to stand at the stove to cook something.  (Tr. 60-61).

---

[1]There is a fair amount of duplication in the administrative record.

[2]In his June 10, 2010 Disability Report, however, plaintiff indicated that he had not "completed any type of specialized job training, trade or vocational school[.]"  (Tr. 194).

According to plaintiff, he would not be able to do laundry because he cannot carry a laundry basket up and down the stairs and his back sometimes locks up if he bends down to pick something up. (Tr. 61).  He must hold railings on both sides to negotiate the stairs.  (Tr. 235).  Although he sometimes babysits for his young niece and nephew, he cannot play with them.  (Tr. 62).  He spends his day watching television or sitting outdoors watching the cars go by.  (Tr. 63, 202, 203). He can sit in the same position for only twenty to thirty minutes.  (Tr. 235).  Most of the time, plaintiff reclines with his feet elevated rather than sitting in a regular chair, as instructed by his physician.  (Tr. 68-69).  According to plaintiff, he would not be able to sit in a regular chair for five or six hours during a workday without getting up periodically and without suffering adverse consequences.  (Tr. 69).  Plaintiff tries to walk for exercise but can go only one block.  (Tr. 63). He can go around the block "on a rea[lly] good day."  (Tr. 235).  Plaintiff must stop and rest after walking about one hundred feet.  (Tr. 207)

Plaintiff does not socialize or go out, leaving the house only for doctor's appointments; he sees his children only when they visit him.  (Tr. 64).  According to plaintiff, he stays at home and folds clothes to help his mother.   (Tr. 199).   He no longer can play sports such as softball and bowling, lift weights, hike or swim.  (Tr. 200, 229).  Plaintiff collects model cars and trucks and goes to tag sales twice a month.  (Tr. 203).  According to plaintiff, he has the "attention span of a flea"; he can read or try to concentrate on something only for a few minutes before he loses focus.  (Tr. 71-72, 234).  Plaintiff states that his memory also is "very bad"; he cannot remember his children's birthdays or much of what he spoke about the previous day.  (Tr. 70-71).

Plaintiff reported taking Oxycontin/Oxycodone and Lisinopril, and using a topical cream. (Tr. 201, 218, 224, 230).   Plaintiff testified that his medications cause constipation and blurry vision and also make him tired.  (Tr. 58; see Tr. 219).  He states that he wakes up hourly during

the night but does not know whether this is a side-effect of his medication.  (Tr. 58).  The medical records also reveal that plaintiff takes or has taken Percocet, Methadone, Zestoretic, Naproxen, Fentanyl, Levitra, Androderm, Androgel, Exalgo, Pamelor, Nucynta and has used Dilaudid gel.  (Tr. 224, 274, 288, 337, 340, 431-32, 435, 447, 450, 453, 457, 460, 463, 466, 469, 472, 475, 479, 482, 485, 488, 491, 494, 463, 469, 472, 505, 508, 511, 515, 518, 521, 524, 527, 530, 533, 536, 539, 542, 545, 548, 551, 634, 637, 640, 643, 646, 649, 652, 655, 658, 661, 664, 667, 670, 673, 676, 679, 682, 685, 688, 692).

Plaintiff testified that he last worked in December 2009; he stopped working because he was laid off.  (Tr. 52-54).[3]  At that time, he was working full-time, delivering fruit and vegetables to stores and catering facilities.  (Tr. 54; see generally Tr. 209).  Plaintiff worked in that job for approximately five years.  (Tr. 54).  Prior to that, plaintiff worked sporadically as a truck driver.  (Tr. 54-55).  During the fifteen years preceding the hearing, the plaintiff has worked only as a truck driver, sometimes loading and unloading items.  (Tr. 55; see Tr. 209, 213-15, 236-40).  Plaintiff also worked as a heavy equipment operator for the Town of East Haven from approximately 1992 until 2000.  (Tr. 75-76).  According to plaintiff, he can no longer work because his back starts to burn and he has four screws in his ankle from a fracture twenty-seven years earlier; the combination of foot and back problems limits his ability to drive and climb up and down from the back of the truck.  (Tr. 56).  Plaintiff stated that his ankle problems have worsened over the years and that one of his doctors told him that he is too young to undergo an ankle replacement.  (Tr. 56-57).

At plaintiff's hearing before the ALJ, Sabella, the vocational expert, testified that an

---

[3]In his disability report, completed on June 10, 2010, however, plaintiff indicated that he stopped working because of his conditions.  (Tr. 193).

individual of plaintiff's age and past work experience, limited to work at the light exertional level except that the individual is limited to lifting and carrying twenty pounds occasionally and ten pounds frequently, standing or walking for four hours, sitting for six hours, unlimited pushing and pulling, occasional use of stairs or ladders, occasional balancing, stooping, kneeling, crouching and crawling, would be able to perform plaintiff's past work as a dump truck driver as plaintiff had performed it.  (Tr. 78-79).  The ALJ then asked the vocational expert if a person could perform plaintiff's past relevant work if the following limitations were added, work at the sedentary level, lifting and carrying five pounds, standing and walking for two hours, sitting for six hours and occasional pushing and pulling.  (Tr. 79).  The vocational expert testified that such a person could not perform plaintiff's past relevant work, but could work as a surveillance system monitor, an electronic or printed board assembler, or an electronic inspection worker.  (Tr. 79-80.)  The ALJ then added the following limitations for a third hypothetical, a sit/stand option or a five-to-ten minute break every hour to walk around.  (Tr. 80).  The vocational expert testified that such an individual would not be able to perform plaintiff's past relevant work and that the required break would render the person unproductive during the break time.  (Tr. 80-81).  If the person only had the sit/stand option added, however, Sabella indicated that there are jobs within the light and sedentary levels of exertion that such a person would be able to perform, including assembly and machine tending work. (Tr. 81-83). Additionally, Sabella acknowledged that if the individual would be "off task [ten to fifteen] percent of the time because [o]f his pain and difficulty concentrating[,]" whether the person would be precluded from employment would depend on the person's productivity while actually on-task; if he were off-task for twenty percent or more of the time, the person would be precluded from employment.  (Tr. 85-86).   Similarly, a person absent more than three times a month also would be precluded from employment.  (Tr. 86).

5

B. PLAINTIFF'S MEDICAL HISTORY

From January 2003 through January 15, 2010, plaintiff was treated by Dr. Julia Shi at the Methadone APT Foundation clinic for chronic right ankle pain, initially with Percocet and then with Oxycodone, usually on a monthly basis; he also received Methadone for opiate dependency.  (Tr. 261-356; see also Tr. 357-84).

On December 18, 2008, plaintiff began treatment with Roger Kasendorf, D.O., a physiatrist[4], at Advanced Health for complaints of chronic pain in his right lower extremities as a result of past multiple fractures; Dr. Kasendorf noted that x-rays revealed multiple bone spurs in plaintiff's right ankle, and the treatment goal was to increase the functional range of motion of the right ankle, decrease muscle spasms/hypertonicity and decrease the current pain level as well as to eliminate the need for Methadone.  (Tr. 395-97, 564-66).

Plaintiff saw thereafter Dr. Kasendorf monthly, from late December 2008 through November 2009; Dr. Kasendorf's diagnosis was status post surgery and degenerative joint disease of the ankle/foot, he also noted opiate dependency, and during this time, Dr. Kasendorf adjusted plaintiff's medications and noted that plaintiff was doing well on the medications; plaintiff described his pain level as between 4/10 and 6/10.  (Tr. 398-444, 567-612).   Methadone was discontinued in April 2009.  (Tr. 414).  In July 2009, plaintiff reported to Dr. Kasendorf that he preferred to continue pain management with medication to avert surgery, as he was not experiencing any side effects from the medication and described his pain as "moderate."  (Tr. 424).  The next month, in August 2009, plaintiff refused an office procedure to have the bone spurs in his feet broken up, stating that he preferred to wait until he had "time off from work to recover since it [was] a busy

---

[4]Dr. Kasendorf's medial records contain a typographical error, in that they refer to his as being a "phsyatrist."

6

time now." (Tr. 427).  Plaintiff was weaned off Methadone during the first quarter of 2009.  (Tr. 414).

Dr. Kasendorf referred plaintiff to Dr. Michael Luchini, an orthopaedic surgeon, in April 2009.  (Tr. 260).  Dr. Luchini noted that twenty-seven years earlier, plaintiff fractured his right ankle and has been treated with an open reduction internal fixation, and since then, plaintiff experienced progressive deterioration of his symptoms with persistent ankle pain.  (Tr. 259).  X-rays revealed "avascular necrosis with some collapse of the body of the talus[]" and "minimal arthritic changes of the distal talar head and navicular."  (Id.).  Dr. Luchini noted symptoms of post-traumatic arthritis of the right ankle.  (Id.).  Plaintiff was walking with a pronounced limp and managed his pain with Percocet and Oxycontin.  (Id.).  Dr. Luchini recommended ankle fusion; he did not recommend an ankle replacement because, considering plaintiff's age group and activity level, he did not feel an ankle replacement would be long lasting.  (Id.).

On December 21, 2009, plaintiff reported "constant, severe, throbbing" pain, but stated that he was "doing well[]" on his medications and experienced no new problems.  (Tr. 445, 503, 613; see also Tr. 445-47, 503-05, 613, 633-34).  Dr. Kasendorf noted that he was unable to elicit any range of motion in the right ankle as a result of severe pain and added diagnoses of chronic pain syndrome, and osteoarthritis and allied disorders; plaintiff's current medications of Oxycodone, Oxycontin, Dilaudid gel and Levitra were continued.  (Tr. 446-47, 504-05, 633-34).

On January 18, 2010, plaintiff reported continued ankle pain and worsening low back pain which he again described his pain as "constant, severe and throbbing[,]" radiating to his right lower extremity.  (Tr. 448, 506, 635; see also Tr. 448-50, 506-08, 635-37).  The back pain was worse when plaintiff was seated.  (Id.).  His right lower extremity "gives out."  (Id.).  Plaintiff also stated that his medications no longer relieved his pain.  (Id.).  Physical examination revealed decreased

7

sensation and increased weakness in the right lower extremity. (Tr. 449, 507, 636). Dr. Kasendorf added a diagnosis of lumbar radiculitis and adjusted plaintiff's medications. (Tr. 449-50, 507-08, 636-37).

On February 15, 2010, plaintiff reported that the adjustment to his medications were "working much better[,]" but he kept the same pain complaints as before. (Tr. 451, 509, 638; see also Tr. 451-53, 509-11, 648-40). Dr. Kasendorf added Angrogel to plaintiff's prescription regimen. (Tr. 453, 511, 640). On February 22, 2010, plaintiff underwent an MRI of the lumbar spine to determine a cause for his complaints of worsening chronic low back pain, and plaintiff also was experiencing pain, tingling and weakness in his right leg; the test revealed "focal left-sided ligamentum flavum and facet hypertrophic changes" at the T10-11 level, mild bulging of the annuli at the T-11-12, L1-2, L2-3 and L3-4 levels as well as a small, broad based and left posterolateral disc herniation at the L4-5 level. (Tr. 385-86, 553-54, 694-95). Nerve conduction studies conducted on February 25, 2010, showed mild left lumbar radiculopathy at L5. (Tr. 512, 555, 696).

Dr. Kasendorf discussed the MRI results with plaintiff on March 15, 2010, but noted no other changes. (Tr. 455-57, 513-15, 641-43). On April 12, 2010, plaintiff reported that he was "more 'alert'" since he started on Androgel, but he also reported back spasms. (Tr. 458, 516, 644; see also Tr. 458-60, 516-18, 644-46). Dr. Kasendorf performed osteopathic manipulation to the lower ribs, lumbar, sacral and gluteal areas and right lower extremities to address plaintiff's pain. (Tr. 460, 518, 645). He noted that plaintiff's condition was "worsening" because he "[could] no longer perform regular functions." (Id.). On May 10, 2010, plaintiff reported experiencing a rash at the site of the Androderm patch, and he also noted increased leg and back pain. (Tr. 461, 519, 647; see also Tr. 467-69, 525-27, 653-55). Dr. Kasendorf ordered use of a home TENS unit to reduce pain and inflammation in plaintiff's ankle. (Tr. 463, 521, 649).

On June 7, 2010, plaintiff reported his ankle pain as mild, rating it as 2/10.  (Tr. 464, 522, 650; see also Tr. 464-66, 522-24, 650-52).  Dr. Kasendorf indicated that the "[p]ain relief [was] efficient with [the] current medication regimen."  (Tr. 466, 524, 652).  On July 5, 2010, plaintiff again characterized his pain as mild, rating it as 5/10 and ranging from 4-8.  (Tr. 467, 525, 653; see also Tr 467-69, 525-27, 653-55).  Dr. Kasendorf continued the current medications and added a trial of Exalgo.  (Tr. 527, 655).  On August 2, 2010 and August 30, 2010, plaintiff reported no change of his ankle or back conditions.  (Tr. 470, 473, 477, 480, 528, 531, 656, 659; see also Tr. 470-82, 528-33, 656-61).[5]  Androderm and Exalgo were discontinued.  (Tr. 472, 530, 658).

On September 22, 2010, no changes to the plaintiff's ankle or back pain were noted, Dr. Kasendorf included an additional diagnosis of reflex sympathetic dystrophy Syndrome ["RSD"], he added a prescription for Pamelor, and referred plaintiff to another doctor for spinal cord stimulator evaluation.  (Tr. 483-85, 534-36, 662-64).  No changes were noted at the October 20, 2010 visit.  (Tr. 486-88, 537-39, 665-67).

On October 25, 2010, plaintiff was examined by Dr. Michael Robbins at Advanced Diagnostic Pain Treatment Centers to determine whether plaintiff was a candidate for spinal cord stimulation to address his right ankle pain.  (Tr. 558-63, 624-28).  Dr. Robbins determined that plaintiff's pain was joint-related and concluded that his best option was total ankle replacement or fusion; a stimulator would not alleviate plaintiff's pain.  (Tr. 563,628).

On November 10, 2010, plaintiff stated that his pain was mild, 4/10 "on a good day[,]"  and no other changes were noted. (Tr. 489-91, 540-42, 668-70).  No changes to plaintiff's condition

---

[5]Plaintiff reported that he experienced pain in his right shoulder that radiated down his arm and prevented him from lifting his right arm; Dr. Kasendorf ordered a diagnostic ultrasound which showed no rotator cuff tear, so that  Dr. Kasendorf diagnosed a sprain or strain.  (Tr. 470-82, 528-33, 656-61). Plaintiff does not claim right shoulder pain as a disabling condition.

were noted on December 15, 2010, January 10, 2011, and February 7, 2011 (Tr. 492-94, 543-51, 671-79).  On February 7, 2011, Dr. Kasendorf added a trial of Nucynta.  (Tr. 551, 679; see also Tr. 549-51, 667-69).  No changes to plaintiff's condition were noted on March 7, May 2, and May 26, 2011.  (Tr. 680-88).  At the last visit, Dr. Kasendorf discontinued the Nucynta and Oxycontin and prescribed Methadone.  (Tr. 688).  On June 6, 2011, plaintiff called and reported that the Methadone was not relieving his pain, and he was instructed to increase the dosage.  (Tr. 689).  The June 20, 2011 progress noted indicated no further problems.  (Tr. 690-92).

    C. MEDICAL OPINIONS

Sometime following his June 25, 2010 examination of plaintiff, Dr. Kasendorf completed an undated Multiple Impairment Questionnaire on behalf of plaintiff, noting diagnoses of osteoarthritis, RSD syndrome, chronic pain symptoms, degenerative joint disease of the foot/ankle and lumbar radiculopathy.  (Tr. 387; see also Tr. 387-94).  Dr. Kasendorf identified increased weakness, increased severe tenderness of the right lower extremities as well as poor gait and balance to support his diagnoses.  (Id.).  He indicated that plaintiff suffers constant sharp pain in his lumbar spine and right lower extremities when he moves.  (Tr. 388-89).  Dr. Kasendorf opined that plaintiff could not continuously sit or stand and walk in any work setting, and he could sit for two hours and stand or walk for two hours in an eight-hour workday.  (Tr. 389).  Plaintiff would have to stand and move about for about ten minutes each hour.  (Tr. 389-90).  Plaintiff could occasionally lift up to twenty pounds and occasionally carry up to ten pounds, but never any more than those amounts. (Tr. 390).  Plaintiff could not perform repetitive lifting for fear of falling.  (Id.).  However, plaintiff had no limitations regarding use of his upper extremities.  (Tr. 390-91).  Plaintiff was taking Oxycodone, Oxycontin and Pamelor along with a topical gel without experiencing any side effects. (Tr. 391).  Dr. Kasendorf opined that plaintiff's symptoms would likely increase in a competitive

10

work environment and that plaintiff cannot perform a full-time competitive job that requires sustained activity.  (Tr. 391-92).  Plaintiff's symptoms, which are likely to last at least twelve months, would frequently interfere with attention and concentration.  (Id.).  Dr. Kasendorf did not consider plaintiff to be a malingerer.  (Tr. 392).  Plaintiff could tolerate moderate work stress, but would have to take unscheduled hourly breaks to rest for at least ten minutes.  (Id.).  Plaintiff would experience good days and bad days and likely be absent from work more than three times per month.  (Tr. 393).  Dr. Kasendorf also posited that plaintiff must avoid heights and not push, pull, kneel, bend or stoop.  (Id,).  Dr. Kasendorf indicated that plaintiff suffered these symptoms and limitations since before he first began treating him.  (Id.).

On December 9, 2010, Dr. Kasendorf prepared an letter in which he opined that plaintiff suffers from chronic pain syndrome, ankle DJD [degenerative joint disease], osteoarthritis, lumbar HNP [herniated nucleus pulposus] and lumbar radiculopathy.  (Tr. 476).  Plaintiff has been receiving pain management at Dr. Kasendorf's office since December 2008 with "good results[.]" (Id.).  Although medications decrease the pain, Dr. Kasendorf rated plaintiff's prognosis for recovery as "poor[]" and concluded that he "cannot perform full-time competitive work due to his chronic pain, which is likely permanent."  (Id.)

On November 7, 2012, Dr. Richard Matza conducted an independent medical examination of plaintiff, prepared a narrative report, and completed a Multiple Impairment Questionnaire.  (Tr. 7-17).  Dr. Matza diagnosed plaintiff as suffering from lumbar spondylosis with T10/11[6] facet arthropathy with left radiculopathy as shown in the nerve conduction studies, a left L4/5 posterior

---

[6]In the narrative, Dr. Matza wrotes "D10/11."  (Tr. 8).  The Court considers the narrative designation a typographical error.  In the questionnaire, he indicated that the facet arthropathy is at T10/11 (Tr. 10), and the only applicable medical record, the MRI, was of the lumbar and thoracic spine.

lateral disc herniation and post traumatic degeneration of the subtalar joint and taylonavicular joint of the right foot.  (Tr. 8).  Although Dr. Matza opined that plaintiff would need surgery to either debride or fuse the taylonavicular joint and fuse the subtalar joint, he did not recommend surgery at this time.  (Id.).  Instead, he recommended that plaintiff lose forty pounds to decrease the load on his back and right foot.  (Id.).  In Dr. Matza's opinion, plaintiff is "certainly incapable of doing full time work at this time and for the foreseeable future" because "he can hardly walk and cannot put weight on his lower extremity on the right hand side, and he has a disc which is causing radicular symptoms on the left hand side."  (Id.).   If weight loss does not allieviate the radicular symptoms, plaintiff also might require surgery on his L4/5 disc.  (Tr. 9).

In the Multiple Impairment Questionnaire, Dr. Matza rated plaintiff's pain as 4/10 and his fatigue as 3/10.  (Tr. 12).  Plaintiff's pain is not completely relieved with medication.  (Id.).  As a result, Dr. Matza concluded that plaintiff could sit or stand/walk for only one hour in an eight-hour workday and could not continuously sit in a work setting.  (Id.).  In his opinion, plaintiff would have to get up and move around about every fifteen to twenty minutes and would be unable to sit again for thirty minutes.  (Tr. 12-13).  Plaintiff can lift or carry up to five pounds occasionally and cannot perform repetitive reaching, handling, fingering or lifting.  (Tr. 13).  Dr. Matza indicated that plaintiff's symptoms would increase if he were placed in a competitive work environment.  (Id.).  His pain is severe enough to "periodically" interfere with attention and concentration.  (Tr. 15).  Plaintiff would need to take unscheduled breaks hourly with each break lasting thirty minutes.  (Id.).  Dr. Matza concluded that plaintiff could tolerate only low stress at work and did not consider him a malingerer.  (Id.).  Although plaintiff would have good days, he would likely be absent from work more then three time per month as a result of his impairment.  (Tr. 16).  Dr. Matza stated that plaintiff cannot push, pull, kneel, bend or stoop and must avoid temperature extremes,

humidity and heights.  (Id.).

On October 7, 2010, Dr. Anita Bennett completed a disability determination, including a Residual Functional Capacity Assessment, on behalf of SSA.  (Tr. 94-98).  Dr. Bennett determined that plaintiff has the following exertional limitations: lifting twenty pounds occasionally and ten pounds frequently, standing or walking for four hours and sitting for six hours with normal breaks in an eight-hour workday.  (Tr. 94-95).  Plaintiff could occasionally climb stairs or ladders, balance, stoop, kneel, crouch and crawl.   (Tr. 95).  Although he has had multiple surgeries on his right ankle/foot in the past and has been seeking pain management, plaintiff's exam was essentially normal in December 2008 with only a mild decreased range of motion.  (Id.).  The only abnormal finding noted in the medical evidence provided was a small bone spur.  (Id.).  Regarding plaintiff's complaints of back pain, Dr. Bennett noted that plaintiff first complained of back pain in April 2009, indicated improvement in June 2009 and did not again mention back pain to treatment providers until January 2010.  (Id.).  Tests showed a mild lumbar radiculopathy and mild degenerative changes with no stenosis or neuroforamina.  (Id.).  In addition, the pain management doctor indicated that pain relief was sufficient with the current medication regimen.  (Id.) Dr. Bennett concluded that plaintiff was able to perform work at the sedentary level of exertion and therefore was not disabled.  (Tr. 97).

On January 13, 2011, Dr. Khurshid Kahn completed a reconsideration disability determination assessment on behalf of SSA.  (Tr. 103-06).  The reconsideration assessment was performed in response to plaintiff's claim that his condition has worsened on October 12, 2010, and that he now has difficulty sitting, standing and walking for long durations.  (Tr. 103).  Dr. Kahn reviewed additional medical evidence including the February 2010 nerve conduction studies.  (Id.).  He concluded that the severity of the limitations asserted was not supported by the objective

13

medical evidence. (Tr. 104). Dr. Kahn's Residual Functional Capacity Assessment mirrored that of Dr. Bennett. (Tr. 105-06). Dr. Kahn agreed that plaintiff was not disabled because he could perform work at the sedentary level of exertion. (Tr. 107-08).

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry. First, the court must decide whether the Commissioner applied the correct legal principles in making the determination. Second, the court must decide whether the determination is supported by substantial evidence. See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008), quoting Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); see also 42 U.S.C. § 405(g). Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998)(citation omitted). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted). However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted). Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise. See 42 U.S.C. §

14

405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. See 42 U.S.C. § 423(a)(1). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process. See 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment. See 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. § 404.1520(a)(4)(iii); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled. See 20 C.F.R. § 404.1520(a)(4)(iii); see also Balsamo, 142 F.3d at 80. If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work. See 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work. See Balsamo, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. See 20 C.F.R. § 404.1520(a)(4)(v); see also Balsamo, 142 F.3d at 80 (citations omitted).

15

The Commissioner may show a claimant's Residual Functional Capacity ["RFC"] by using guidelines ["the Grid"].  The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled.  See 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations).  A proper application of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered.  See 20 C.F.R. § 200.00(e)(2).  If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity.  See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996), citing Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986).

IV.  DISCUSSION

Following the five step evaluation process ALJ Diamond found that plaintiff has not engaged in substantial gainful activity since December 15, 2009, his alleged onset date of disability.  (Tr. 30-31).  ALJ Diamond then concluded that plaintiff has the following severe impairments: lumbar degenerative disc disease and post traumatic arthritis of the right ankle, but he does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 31).  ALJ Diamond found that plaintiff lacks the RFC to perform the full range of work at the sedentary level.  (Tr. 32-34).  The ALJ concluded that plaintiff is unable to perform any past relevant work, but considering his age,

16

education, work experience and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform, such as a jewelry assembler or machine tender.  (Tr. 34-35). Accordingly, the ALJ concluded that plaintiff has not been under a disability from December 15, 2009 through the date of her decision.  (Tr. 36).

Plaintiff moves for judgment on the pleadings with an immediate award of benefits or remand to the Commissioner on grounds that the ALJ failed to apply the treating source rule (Dkt. #12, Brief at 6-11)[7]; the ALJ improperly evaluated plaintiff's credibility (id. at 11-14); and the ALJ relied on flawed vocational expert testimony (id. at 14-17).

In response, defendant asserts that the ALJ's followed the treating physician rule (Dkt. #14, Brief at 3-6); the ALJ's evaluation of plaintiff's credibility is supported by substantial evidence (id. at 6-9); and the ALJ's step five finding that plaintiff can perform work existing in significant numbers in the national economy is supported by substantial evidence (id. at 9).

A. TREATING PHYSICIAN RULE

In her decision, the ALJ affords "little weight" to Dr. Kasendorf's assessment of plaintiff's residual functional capacity on grounds that his opinions "are inconsistent with the claimant's testimony regarding his abilities.  The claimant testified that his capabilities are greater than those assigned by the physician and that he manages as long as he is able to change positions as necessary."  (Tr. 34).   The ALJ did not consider the opinion of Dr. Matza, as that assessment was not obtained until after the ALJ rendered her decision.  The ALJ also afforded "limited weight" to the opinions of the non-examining State agency sources, Drs. Anita Bennett and Khurshid Kahn, "because evidence received at the hearing level shows that the claimant is more limited than

_____

[7]The page numbers refer to the numbers in plaintiff's brief, not as they appear on CM/ECF.

17

determined by the State agency consultants."  (Id.)

"[T]he SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant."  Burgess, 537 F.3d at 128, quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)(internal quotations & alteration omitted)).  The treating physician rule provides that "[t]he opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence."  Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(citations omitted); see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  "[T]he opinion of the treating physician is not afforded controlling weight[,]" however, where "the treating physician issued opinions that are not consistent with other substantial evidence in the record[.]"  Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)(citations omitted).

The ALJ must consider all of the following factors in deciding the weight assigned to any medical opinion:

> (i) the frequency of the examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran, 362 F.3d at 32, citing former 20 C.F.R. § 404.1527(d)(2), now § 404.1527(c)(2).  "After considering the above factors, the ALJ must 'comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion.'"  Burgess,  537 F.3d at 129, quoting Halloran, 362 F.3d at 33; see 20 C.F.R. § 404.1527(c)(2)(stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion.")(emphasis added).  The treating physician's opinion is assigned greater weight because of the "continuity of treatment . . . provide[d]" and because  "the doctor/patient relationship [the

treating source] develops place[s] [the treating source] in a unique position to make a complete and accurate diagnosis of his [or her] patient." Mongeur v. Heckler, 722 F.2d 1033, 1039, n.2 (2d Cir. 1983)(citations omitted).

In this case, Dr. Kasendorf consistently treated plaintiff on a monthly basis beginning in December 2008, a year before plaintiff's alleged onset date.  (See Tr. 395).  This regular contact allowed for the development of a close treatment relationship which is reflected in the contemporaneous treatment notes in the administrative record.  See Halloran, 362 F.3d at 32.  Yet, in spite of the consistency and longevity of treatment from plaintiff's treating sources, the ALJ assigned little weight to his opinion on the following grounds:

> Dr. Kasendorf's undated Multiple Impairment Questionnaire indicates that the claimant's limitations are significantly below the sedentary exertional level.  The undersigned gives the opinions little weight because they are inconsistent with the claimant's testimony regarding his abilities.  The claimant testified that his capabilities are greater than those assigned by the physician and that he manages as long as he is able to change positions as necessary.  Dr. Kasendorf's opinion that the claimant is unable to perform competitive work due to his chronic pain is an assessment of the extent of the claimant's disability, which is an issue reserved to the commissioner and is not entitled to any special significance.

(Tr. 34)(internal citations omitted).

Plaintiff contends that the ALJ relied on his testimony that he could stand or walk between two and three hours and sit for the remainder of the day, but failed to acknowledge his testimony that he spent most of his day reclining or sitting with his foot elevated; he did not testify that he could sit for six hours in a competitive work environment.  (Dkt. #12, Brief at 10-11).  Defendant contends that the ALJ did not err in disregarding this testimony because the medical record and plaintiff's reports of his activities of daily living make no reference to reclining or elevation of his foot.  (Dkt. #14, Brief at 4-5).

The medical records indicate that throughout 2010, plaintiff consistently complained that

his back pain worsened when he was seated.  (See Tr. 506 (January 2010), 509 (February 2010), 513 (March 2010), 516 (April 2010), 519 (May 2010), 522 (June 2010), 525 (July 2010), 528 & 531 (August 2010), 534 (September 2010), 537 (October 2010), 540 (November 2010), 543 (December 2010)).  Although Dr. Kasendorf does not mention sitting or reclining in his progress notes, in both opinions he indicated that plaintiff's symptoms would increase in a competitive work environment.  (Tr. 392, 476).  In the Multiple Impairment Questionnaire, Dr. Kasendorf opined that plaintiff's symptoms would likely increase in a competitive work environment, would interfere with his ability to concentrate and focus on the task, and that plaintiff cannot perform a full-time competitive job that requires sustained activity.  (Tr. 391-92).  In his opinion letter, Dr. Kasendorf stated that plaintiff's chronic pain would preclude him from performing full-time competitive work.  (Tr. 476).

The record lacks evidence of plaintiff's ability to sit and focus during an average workday. The ALJ acknowledges that plaintiff's "pain, coupled with his pain medication, likely affects his concentration."  (Tr. 33).  Relying on treatment notes indicating efficient pain relief, the ALJ concludes that the medical records do not support a complete inability to perform any type of work on a consistent basis.  (Id.).  Those treatment notes, however, do not indicate the effect of the pain medications on plaintiff's ability to concentrate and perform work on a consistent basis. Plaintiff reported that he has difficulty completing tasks because he has to stop frequently; he "can't do much of anything for very long."  (Tr. 205).  He cannot concentrate because he always is in pain; he can pay attention for only fifteen minutes.  (Tr. 206, 207).  The ALJ does not reconcile these reported statements with her conclusion.  Absent relevant medical evidence, the ALJ could have further developed the record, by contacting plaintiff's treating physician, Dr. Kasendorf, or requesting an opinion by a medical expert pursuant to 20 C.F.R. § 404.1527(e)(2)(iii).

20

The ALJ cites the absence of evidence of a significant deterioration in plaintiff's medical condition, lasting more than twelve months, since he was laid off from his previous job. (Tr. 33). She does not, however, address the worsening back pain that was first noted in the medical records in January 2010 and has continued since that time. Plaintiff testified that his back pain has progressively worsened until, at the time of the hearing, it affects everything plaintiff does. (Tr. 72). The ALJ also relied on plaintiff's statement that he can watch his nephew and niece, ages six and three to discount plaintiff's testimony regarding his limitations. (Tr. 33). Plaintiff testified that this entailed getting the children a drink if they asked, watching cartoons with the children, and sometimes, walking to the end of the driveway to see his nephew get onto or off the school bus. (Tr. 62-63). The ALJ elicited no information regarding the duration or frequency of this activity. The ALJ does not reconcile this limited activity with her rejection of plaintiff's stated limitations. Without such an analysis, the court cannot determine whether the ALJ's conclusion regarding plaintiff's limitations is supported by substantial evidence.

Additionally, defendant argues that the ALJ properly disregarded Dr. Kasendorf's opinion that plaintiff was unable to work full time. (Dkt. #14, Brief at 5-6). Plaintiff argues that this statement constitutes a medical opinion. (Dkt.#12, Brief at 8-9).

Pursuant to 20 C.F.R. § 416.927(d)(1), the opinion of a treating physician on an issue reserved to the Commissioner, such as an opinion that the claimant is "disabled" or "unable to work" is not considered a "medical opinion" entitled to controlling weight. See 20 C.F.R. § 416.927(d)(3). Such an opinion is an administrative finding dispositive of the case and thus a matter reserved for the commissioner. See 20 C.F.R. § 416.927(d). Medical opinions on matters reserved to the commissioner are not entitled to controlling weight under the treating physician rule. See, e.g., Cardozo v. Astrue, No. 3:10 CV 1951 (MRK)(WIG), 2012 WL 3727160, at *3 (D.

21

Conn. Apr. 13, 2012)(citing cases).

Although not entitled to controlling weight, a treating physician's opinion on whether a claimant is able to perform in a competitive work environment cannot be ignored by the ALJ. Rather, the ALJ must determine whether the treating physician's assessment is supported by evidence in the record.  See SSR-96-5p, 1996 WL 374183, at *3 (S.S.A. July 2, 1996).  Here, the ALJ disregarded Dr. Kasendorf's opinion that plaintiff was unable to perform full-time competitive work and includes no discussion whether the record evidence supported this conclusion.  Thus, the ALJ applied an incorrect legal standard in evaluating the treating physician's opinion and the case must be remanded for further development of the record.  See Rosa, 168 F.3d at 82-83 (remand for further development of the record is proper "[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard")(citations omitted).

### B.  OTHER ARGUMENTS

In light of this conclusion regarding the ALJ's failure to properly apply the treating physician rule, the Court need not address plaintiff's claims regarding the ALJ's functional capacity assessment, and regarding the ALJ's credibility assessment, as, on remand, further consideration and proper application of the treating physician rule may alter the ALJ's subsequent findings relating to plaintiff's RFC and credibility.

### V. CONCLUSION

Accordingly, for the reasons stated above, plaintiff's Motion for Judgment on the Pleadings (Dkt. #11) is granted such that the case is remanded for further proceedings consistent with this Recommended Ruling, and defendant's Motion to Affirm (Dkt. #14) is denied.

The parties are free to seek the district judge's review of this recommended ruling.  See 28 U.S.C. § 636(b)(**written objection to ruling must be filed within fourteen calendar days**

22

**after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 3rd day of March, 2014.


/s/ Joan G. Margolis, USMJ_____
Joan Glazer Margolis
United States Magistrate Judge